UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PATRICK JOHN O'DELL,                              :

                         Plaintiff,        :                    16 Civ. 368 (AJP)

            -against-                    :        **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of               :
Social Security,

                                      :

                  Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Patrick O'Dell brings this action pursuant to § 205(g) of the Social Security

Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security

denying his application for Disability Insurance Benefits ("DIB").  (Dkt. No. 1: Compl.)  Presently

before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R.

Civ. P. 12(c).  (Dkt. No. 24: O'Dell Notice of Mot.; Dkt. No. 27: Comm'r Notice of Mot.)  The

parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28

U.S.C. § 636(c).  (Dkt. No. 17.)

        For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 27) is GRANTED and O'Dell's motion (Dkt. No. 24) is DENIED.

## FACTS

### Procedural Background

        O'Dell filed an application for DIB on November 1, 2012, alleging a disability onset

date of April 27, 2012.  (Dkt. No. 21: Administrative Record ("R.") 64, 143-44.)  The Social

Security Administration ("SSA") denied O'Dell's application on February 15, 2013.  (R. 78-81.)

O'Dell requested a hearing before an Administrative Law Judge ("ALJ") on March 5, 2013.  (R.

82-83.)  On February 27, 2014, O'Dell had a hearing before ALJ Michael J. Stacchini.  (R. 28-63.)

At the hearing, represented by counsel, O'Dell amended the alleged disability onset date to May 27,

2011.  (R. 30, 36-37.)  On June 20, 2014, ALJ Stacchini issued a written decision finding O'Dell not

disabled within the meaning of the Social Security Act.  (R. 9-22.)  ALJ Stacchini's decision became

the Commissioner's final decision when the Appeals Council denied review on November 19, 2015.

(R. 1-7.)

**<u>Non-Medical Evidence and Testimony</u>**

Born on October 26, 1982, O'Dell was twenty-eight years old at the alleged May 27,

2011 onset of his disability.  (R. 64-65.)  In a December 13, 2012 function report (R. 191-201),

O'Dell stated that between waking up in the morning and going to bed at night, he would typically

shower, shave, watch television, take naps, read, use the computer and otherwise stay in bed most

of the time (R. 192).  For meals, O'Dell would eat out and "fix quick and simple meals such as

salads, sandwiches [and] soups" two or three days a week.  (R. 193.)  He stated that he was capable

of performing "[l]ight chores" (R. 194), that he would go outside every day (<u>id.</u>), and that he was

able to drive short distances and shop for basic necessities (R. 195).  His hobbies included

performing volunteer administrative services for the fire department.  (R. 195.)  Depending on how

he was feeling physically and mentally, O'Dell would "spend time with others by visiting them at

their homes, going out to dinner," and by attending sporting events.  (R. 196.)  O'Dell asserted that

as a result of his physical condition, his ability to lift, stand, walk and sit was "[l]imited."  (<u>Id.</u>)  He

also stated that his sleep was affected by nightmares, which he attributed to posttraumatic stress

disorder ("PTSD").  (R. 192.)  In combination with his anxiety and depression, O'Dell's PTSD made

it more difficult to get along with people in authority.  (R. 198.)  Finally, O'Dell's function report indicated that he experienced unpredictable chest and neck pain.  (R. 200.)  For his chest pain, he would take nitroglycerin, which sometimes made him dizzy.  (R. 200-01.)  He would take Motrin for his neck pain as needed.  (R. 200.)

During his hearing before ALJ Stacchini on February 27, 2014, O'Dell testified that he was living with his parents (R. 34), and that he was "not big on being alone" due to the attacks of angina that occasionally would wake him up at night (R. 56-57).  He testified that he did "minimal" chores at his parents' house, including laundry and preparing meals for himself.  (R. 38.)  He stated that he was capable of driving, and that he would go shopping for clothing and personal necessities.  (R. 39.)  O'Dell testified that he was "a member of multiple volunteer agencies," including an "ambulance corps, . . . a couple of different fire departments[,] . . . an Elks club . . . [and] the Knights of Columbus."  (Id.)  He would occasionally "visit[] and chat[]" and "socialize" at events for these organizations, but stated that he did not "go to too many meetings" anymore.  (Id.)

O'Dell also testified regarding his volunteer work with the fire department (R. 39-41) and an ambulance company (R. 41), which lasted until January 1, 2014.  (R. 40.)  He stated that his duties at the fire department included "making sure that the equipment was there," and calling vendors when equipment needed repair.  (R. 41.)  With the ambulance company, O'Dell was the chief operating officer and "oversaw the daily operation of the vehicles, the paid staff, and the volunteers."  (Id.)  Some weeks, however, O'Dell "wouldn't be there at all . . . .  [T]here were a lot of things [he] could do from [his] laptop while [he] was laying in bed at home."  (R. 46.)  O'Dell testified that he stopped volunteering because "[i]t became too much . . . .  I wasn't able to relax and . . . it was more than I could handle."  (R. 41.)

O'Dell worked as a "full duty" police officer (R. 37) from February 2007 until 2010 (R. 74).  At some point in 2010, O'Dell was placed on light duty (see R. 36-37), which involved "answering every call that came in, . . . sitting in a desk, dealing with the people coming into the building, [and] assigning calls to the . . . units" (R. 38).  This period of light duty was the result of a motor vehicle accident in 2009 (R. 50) and the onset of his angina, which began with his admission to the ER in October 2010 (R. 42).  O'Dell testified that he worked light duty until May 27, 2011 (R. 36), when he resigned from the police department because of "the problems with [his] heart" and "problems with depression" (R. 41).

With regard to his medical conditions, O'Dell stated that he experiences attacks of angina that occur at random and with varying severity.  (R. 42-43, 56.)  Those attacks cause chest pain (R. 56), and sometimes cause dizziness (R. 43) and/or "some shortness of breath" (R. 56).  O'Dell stated that the most severe attacks feel "like having a large truck parked in the center of [his] chest."  (R. 56.)  The attacks would occur at "any time" (R. 42); O'Dell testified that he has "woken up in the middle of very bad attacks" (R. 56).  He further stated that he had not "had any ER visits since the original onset" of his angina in October 2010, but that he had made emergency visits to his cardiologist's office in connection with the attacks.  (R. 42.)  With regard to managing the attacks, O'Dell testified that "there was nothing more tha[t] could be done other than the taking of nitroglycerin."  (R. 43.)

O'Dell testified that he experienced neck and back pain, which had recently developed into "left-sided weakness," "a problem with [his] hands shaking," and "some loss of balance."  (R. 43-44.)  He attributed these problems to the 2009 motor vehicle accident, and stated that the problems appeared to be getting worse.  (R. 49-51.)  He testified that his back and neck pain "usually maintains a 3 to a 4" on a ten-point scale, but that it has been as bad as seven out of ten.

(R. 54.) O'Dell further stated that at the time of the hearing, he was receiving chiropractic treatment (R. 44) and taking "[o]nly over-the-counter ibuprofen . . . maybe four to five times a week" to manage his neck and back pain (R. 45-46). He implied that he had not sought more vigorous medical treatment because he lost his health insurance coverage in May 2012 and therefore was paying for all treatment out of pocket. (R. 44.) He asserted that, due to his back and neck problems, he would have to get up and walk around after an hour of sitting if the chair was not comfortable. (R. 55.)

O'Dell described his mental impairments as "anxiety, depression, [and] . . . post-traumatic stress." (R. 47.) He stated that he has nightmares and "a lot of trouble sleeping at night." (R. 44.) He further asserted that he has "a very hard time in large crowds especially if [he is] not . . . with other people that [he is] comfortable with." (Id.) He stated that he has "a lot of anxiety," and that even "the most minor thing in the world" can trigger stress or cause him to become upset. (R. 44-45.) He testified that "sometimes [he] spend[s] two to three days in bed" (R. 47), and he resigned from his position as a police officer partly because of his "problems with depression" (R. 41). O'Dell admitted that he spent time with friends by going out to eat at restaurants, but asserted that he did not do much else in the way of socializing. (R. 46.)

Finally, the Court notes that at the beginning of the hearing, O'Dell's counsel answered "[y]es" when ALJ Stacchini asked: "do I have all medical evidence that bears on disability . . . including any and all opinions[?]" (R. 33.)

**Medical Evidence Before the ALJ**

### Evidence Pertaining to O'Dell's Angina

#### Treating Physician Dr. Saleem Choudhry

O'Dell began seeing cardiologist Dr. Saleem Choudhry in 1997. (See R. 485.) On

June 21, 2011, O'Dell visited Dr. Choudhry with complaints of "severe chest pain," shortness of breath and heart palpitations.  (R. 424.)  Dr. Choudhry noted that O'Dell's attacks of such symptoms were becoming "more frequent" and "less predictable"; Dr. Choudhry "[a]dvised [O'Dell] not to return to work because of the stress level."  (Id.)  During an August 2, 2011 visit, Dr. Choudhry noted that O'Dell "continues to have severe chest pain mostly with mental stress—mostly connected to work related issues."  (R. 421.)  A May 21, 2012 note by Dr. Choudhry stated that he conducted a stress test due to O'Dell's complaints of chest pain and "[s]evere [h]ypertension."  (R. 402, 404.)  The stress test revealed no indication of ischemia[1] and "[n]o significant localized wall motion abnormalities" in O'Dell's heart.  (R. 402.)  Additional documents in the record indicate that O'Dell visited Dr. Choudhry with similar reports of chest pain on October 21, 2011 (R. 418), December 19, 2011 (R. 415), February 20, 2012 (R. 410), and November 27, 2012 (R. 399); O'Dell submitted to electrocardiogram tests on each of those occasions.

On November 29, 2012, Dr. Choudhry filled out a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  (R. 384-89.)  In sections of that form prompting Dr. Choudhry to estimate the amount O'Dell could lift or carry, Dr. Choudhry wrote "unknown."  (R. 384.)  Dr. Choudhry also indicated on the form that O'Dell "has Prinzmetal's Angina"[2] and that "it is unknown when he will have an attack."  (Id.)  The rest of the form—which contained additional sections prompting Dr. Choudhry to indicate, inter alia, O'Dell's ability to sit, walk and

---

[1]   "Ischemia" is "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel."  Dorland's Illustrated Medical Dictionary at 961 (32d ed. 2012).

[2]   "Prinzmetal's angina" is "a variant of angina pectoris, often considered a form of unstable angina, in which the attacks occur during rest, exercise capacity is often well preserved . . . . Focal spasm of an epicardial coronary artery causes transient abrupt reduction of arterial diameter, resulting in myocardial ischemia."  Dorland's Illustrated Medical Dictionary at 83.

stand—was left blank.  (See R. 385-89.)

The record contains a second Medical Source Statement of Ability to Do Work-Related Activities (Physical) by Dr. Choudhry, dated January 31, 2014.  (R. 513-18.)  Dr. Choudhry checked boxes corresponding to estimates of O'Dell's ability to lift and carry certain weights at specified intervals and indicated his opinion that O'Dell was capable of sitting, standing and walking for one hour without interruption.  (See R. 513-14.)  Dr. Choudhry, however, noted that his estimates were "approximate" and that O'Dell's actual abilities were "in fact unknown."  (Id.)  On the latter pages of the form, Dr. Choudhry once again declined to offer specific estimates of O'Dell's abilities by writing "unknown" in numerous places.  (R. 514-18.)  Dr. Choudhry also wrote on the form that O'Dell was "unable to function as a police officer" (R. 518), and that this assessment was supported by tests which "included stress test, Holter, echocardiogram, and coronary angiogram" (R. 513).

Finally, the record contains a letter from Dr. Choudhry dated January 31, 2014 (R. 512), stating in full:

> Mr. O'[D]ell is seen under my care.  He is diagnos[ed] with [P]rinzmetal's angina. In my opinion, this patient gets severe chest tightness, diaphoresis,[3/] shortness of breath and dizziness, which could result in acute myocardial infarction.  In view of the above this patient is totally and permanently disabled.

(R. 512.)

### Examining Physician Dr. Iftikhar Ali

On January 15, 2013, Dr. Iftikhar Ali conducted an internal medicine examination of O'Dell pursuant to a referral from the Division of Disability Determination.  (R. 497.)  Dr. Ali stated that O'Dell complained of chest pains that first began on October 3, 2010 after O'Dell "had an argument with his boss."  (Id.)  The report further states that as a result of that incident, O'Dell

---

[3/]      "Diaphoresis" is "sweating."  Dorland's Illustrated Medical Dictionary at 509.

"was diagnosed as having spastic unstable angina." (Id.) O'Dell described subsequent "on and off attacks of the chest discomfort and the severity of the pain is 4/10." (Id.)

> [O'Dell] described it as having sometimes three attacks in a day or sometimes an attack after every one to three days or in a week.  When he has chest discomfort and the chest pain, he takes nitroglycerin spray, or patch, or the tablet and that pain lasts for only five to seven minutes.  After that the pain disappears, but he still feels some flushing sensations.

(Id.)

Dr. Ali's report discussed O'Dell's history of hypertension.  (R. 498.)  Dr. Ali noted that "[s]ometimes [O'Dell] does feel lightheadedness.  Other than that there is no associated symptoms" of hypertension.  (Id.)  O'Dell reported to Dr. Ali that his hypertension "is pretty much under control with the medications" he takes.  (Id.)

O'Dell also told Dr. Ali that "[h]e is able to do cooking, cleaning, laundry, and shopping.  He can shower, bathe, and dress himself.  He spends his time watching TV, listening to the radio, going to restaurants and social clubs, and spends time with his buddies in the EMS and the Fire Department."  (R. 498-99.)[4]

Dr. Ali opined that during his examination, O'Dell's heart exhibited a "[r]egular rhythm" with "[n]o murmur, gallop, or rub audible."  (R. 499.)  Dr. Ali concluded that O'Dell has "no restriction" but "must carry his nitroglycerin spray and patch all the time."  (R. 500.)  Dr. Ali also opined that O'Dell "should avoid activities requiring moderate exertion or greater secondary

---

[4]    ALJ Stacchini twice cites Dr. Ali's report in support of the statement that O'Dell "goes out to restaurants and climbs."  (R. 15, 20.)  Dr. Ali's report, however, instead states that O'Dell "spends his time . . . going to restaurants and social clubs."  (R. 498, emphasis added.)  Nowhere does Dr. Ali's report state that O'Dell "climbs" (see R. 497-501), and no such statement appears elsewhere in the record.  ALJ Stacchini's disability determination does not place any significant weight on O'Dell's "climbing."  (See generally R. 14-21.)  It appears that ALJ Stacchini's assertion that O'Dell "climbs" is a typo, and that ALJ Stacchini intended to state that O'Dell "goes out to restaurants and clubs."

to angina."  (R. 500-01.)

### Reviewing Cardiologist Dr. A. Auerbach

On December 28, 2012, the New York State Office of Temporary and Disability Assistance sent O'Dell's medical records to cardiologist Dr. A. Auerbach for review.  (R. 490.)  Dr. Auerbach reported that O'Dell's "stress tests have been negative," his "[e]chocardiograms have been normal without significant valvular disease," and that his "cardiac exams have been stable and without signs of failure."  (Id.)  Dr. Auerbach also noted that O'Dell underwent a cardiac catheterization in December 2010 that "only demonstrated a discrete 20%, nonobstructive, lesion in the proximal LAD," and that "[t]here has been mention that mental stress aggravates [O'Dell's] chest pain." (Id.) Dr. Auerbach opined that O'Dell's hypertension "appears under adequate control," and that "[b]ased on the available medical evidence, no cardiac MDI [medically determinable impairment] has been demonstrated that would have significant impact" on O'Dell's residual functional capacity.  (Id.)

### Reviewing Cardiologist Dr. Stanley L. Halprin

On March 18, 2013, cardiologist Dr. Stanley Halprin evaluated O'Dell's medical records in connection with O'Dell's application for retirement benefits with the police department. (R. 528.)  Dr. Halprin's report[5/] states that O'Dell's stress tests were not positive for abnormalities and, in fact, "could be considered negative."  (Id.)  Dr. Halprin also observed that all of O'Dell's "electrocardiograms noted and documented in the record were within normal limits and there was

---

[5/]   Dr. Halprin's report was three pages in length, but the second page is missing from the record.  (See R. 528-29.)  Because the administrative record's pagination remains consistent, the Court assumes that the same page was missing from the record before ALJ Stacchini. (Id.)  Thus, only those aspects of Dr. Halprin's opinion adequately supported by the information contained in the record are relied upon herein.  (See pages 34, 48 below.)

no abnormal EKGs consistent with coronary artery spasm seen." (R. 529.) As a result of his review of O'Dell's records, Dr. Halprin concluded that there was insufficient evidence "to state unequivocally that this patient is suffering from coronary artery spasm." (Id.) Dr. Halprin opined, moreover, that "[i]t is certainly conceivable that [O'Dell's] chest pain occurs as a result of his anxiety." (Id.)

### Evidence Pertaining to O'Dell's Back and Neck Pain

#### Chiropractor Dr. Patrick M. Malouf

O'Dell began seeing chiropractor Dr. Patrick Malouf in February 2011.[6/] (See R. 504.) In a report prepared for the New York State Office of Temporary and Disability Assistance on January 22, 2013 (R. 504-11), Dr. Malouf relayed O'Dell's subjective complaints of neck pain and apparent hyperkyphosis.[7/] (R. 504.) Dr. Malouf stated that O'Dell had received six chiropractic spinal correction procedures and described O'Dell's prognosis as "poor." (R. 505.) Dr. Malouf opined that O'Dell showed signs of subluxation[8/] in his C5, C6, and C7 vertebrae with a "possible fracture of right C7 lamina." (R. 506.)

In a letter written by Dr. Malouf on January 22, 2014—one year after his report to the state of New York—Dr. Malouf stated that "O'Dell sustained injuries to his neck and back on

---

[6/]    ALJ Stacchini's opinion incorrectly refers to Dr. Malouf as "Dr. Malone," and also incorrectly identifies Dr. Malouf as a "treating physician" rather than a treating chiropractor. (See pages 48-50 & n.38 below.)

[7/]    "Kyphosis" is "abnormally increased convexity in the curvature of the thoracic vertebral column as viewed from the side." Dorland's Illustrated Medical Dictionary at 992 (32d ed. 2012).

[8/]    "Subluxation" is "in chiropractic, any mechanical impediment to nerve function; originally, a vertebral displacement believed to impair nerve function." Dorland's Illustrated Medical Dictionary at 1791.

12-07-2007 doing work related activities." (R. 511.) The letter asserts that O'Dell received treatment in Dr. Malouf's office five times in 2011, one time in 2012, and twice in 2013. (Id.) Dr. Malouf further opined that during an examination on January 14, 2014, O'Dell "was exhibiting signs of myelopathy, abnormal upper extremity reflexes, left upper extremity muscle weakness, and a loss of balance in his lower extremities." (Id.) Dr. Malouf stated that thoracic MRIs taken on December 18, 2007 showed that O'Dell "has multiple areas of disc herniations, T6-7-8 are of particular concern as they abut the spinal cord." (Id.)

Dr. Malouf also prepared a Doctor's Initial Report for the New York State Workers' Compensation Board on January 27, 2014. (R. 569-72.) In that report, Dr. Malouf stated that O'Dell is experiencing neck pain and that he is suffering from "cervical and thoracic disc herniations affecting the spine and nerve roots." (R. 569-70.) Dr. Malouf's report also noted O'Dell's subjective complaints of numbness, tingling, loss of balance in his legs, weakness in his left hand, pain and stiffness. (Id.) Dr. Malouf reported restrictions in O'Dell's range of motion, pain and tenderness in his spine, palpable muscle spasm in his spine, and weakness in his upper left extremity. (R. 571.) Dr. Malouf described O'Dell's prognosis as "poor" and recommended further "chiropractic manipulation to the spine" as treatment. (Id.)

On January 30, 2014, Dr. Malouf completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form. (R. 522-27.) Dr. Malouf opined that O'Dell could lift up to twenty pounds frequently,[9] up to 100 pounds occasionally,[10] and that he could carry up

---

[9]    The form defines "frequently" as "from one-third to two-thirds of" an eight-hour workday in a five-day workweek. (R. 522.)

[10]    The form defines "occasionally" as "very little to one third of" an eight-hour workday in a five-day workweek. (R. 522.)

to ten pounds frequently and up to 100 pounds occasionally.  (R. 522.)  Dr. Malouf also assessed that

O'Dell could sit, stand, or walk for one hour without interruption; O'Dell could sit for four hours

total in an eight-hour workday, and both stand and walk for two hours total in an eight-hour

workday.  (R. 523.)[11/]

> In support of these assessments, Dr. Malouf cited "MRI findings of cervical disc
herniations and thoracic herniations that abut the spinal cord."  (R. 522.)  He also noted that O'Dell's
most recent chiropractic examination revealed "asym[m]etrical DTR reflexes in the upper extremity
as well as hyper-reflexive lower extremity DTR."  (Id.)  Dr. Malouf opined that "[d]ue to [O'Dell's]
MRI results of spinal cord compression due to herniated disc as a result of trauma he cannot work
as a policeman."  (R. 527.)  Dr. Malouf asserted that O'Dell's limitations had lasted or would
continue to last for at least twelve consecutive months.  (Id.)

> In an April 22, 2014 Doctor's Progress Report (R. 582-83) completed in connection
with O'Dell's application for worker's compensation, Dr. Malouf stated that O'Dell presented with
"subjective complaints [of] thoracic pain radiating into both legs with weakness," that O'Dell had
been referred for EMG/NCS testing and a thoracic MRI (R. 583), and that he had been diagnosed
with thoracic disc herniation with myelopathy (R. 582).  In similar report dated June 3, 2014, Dr.
Malouf stated that O'Dell reported "subjective complaints [of] cervical pain radiating into both arms

---

[11/]     Dr. Malouf also indicated that O'Dell was capable of frequently reaching, handling,
fingering, feeling, pushing and pulling (R. 524); frequently climbing stairs and ramps; could
occasionally balance, kneel, crouch and crawl (R. 525); but he could never stoop or climb
ladders or scaffolds (id.).  Dr. Malouf stated that O'Dell should never be exposed to
unprotected heights; occasionally could be exposed to moving mechanical parts; could
frequently operate a motor vehicle; and could continuously be exposed to humidity, wetness,
dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat and vibrations.  (R. 526.)

with weakness." (R. 566.)[12]

A May 21, 2014 MRI of O'Dell's cervical spine revealed "[n]o evidence of disc herniation or spinal canal stenosis" and a "[s]mall disc bulge at T2-3." (R. 543.) A May 23, 2014 MRI of his thoracic spine revealed "[m]inimal superior endplate depression of the T6 vertebral body," "[d]isc bulging at the T2-3 and T6-7 levels resulting in flattening and deformity of the ventral aspect of the cord without cord compression," and disc bulging at the T4-5 and T7-8 levels "resulting in effacement of the thecal sac." (R. 550.) The May 23, 2014 MRI also indicated that O'Dell's spinal cord demonstrated "normal signal intensity on all pulse sequences." (Id.) On June 5, 2014, O'Dell underwent electromyographic and nerve conduction testing that indicated "[c]hronic left C7 radiculopathy." (R. 545.) A June 11, 2014 x-ray study of O'Dell's cervical spine revealed "[m]ild to moderate degenerative changes . . . of C1," but that "[t]he remainder of the complete cervical spine x-ray series, including flexion and extension views is otherwise unremarkable." (R. 552.) On August 13, 2014, O'Dell underwent a Spinal Biomechanical Engineering study that revealed O'Dell's C1-C7 cervical spine to be "within normal rotational limits," and his C2-C7 cervical spine to be "within normal limits for segmental translation." (R. 554-55.) The test interpreter for that study opined that O'Dell "does not qualify for a whole body impairment." (R. 555.)

**Examining Physician Dr. Iftikhar Ali**

In the January 15, 2013 report prepared by Dr. Iftikhar Ali following his in-person

---

[12] The record contains additional Doctor's Progress Reports dated after ALJ Stacchini rendered his decision. (See R. 573-79.) Although new and material evidence may be submitted to the Appeals Council subsequent to an ALJ decision, such evidence must "relate[] to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); see also, e.g., Cahill v. Colvin, 12 Civ. 9445, 2014 WL 7392895 at *31 (S.D.N.Y. Dec. 29, 2014). The Court therefore does not address these later reports.

examination of O'Dell (R. 497), Dr. Ali stated that O'Dell presented with complaints of "intermittent neck pain" that began in 2009.  (R. 498.)  O'Dell told Dr. Ali that his neck pain is mostly an "uncomfortable feeling," which he would rate as a one or two on a ten-point scale.  (Id.)  O'Dell further reported that the pain "comes and goes," and that it appeared to be aggravated by sitting or lying in certain positions.  (Id.)  On examination, Dr. Ali found that O'Dell's gait and stance were normal, that he used no assistive devices, and that he was able to rise from a chair and get on and off the exam table without difficulty.  (R. 499.)  Dr. Ali further reported that O'Dell's cervical and lumbar spine showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (R. 500.)  O'Dell had a full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally.  (Id.)  O'Dell's reflexes were "physiologic and equal," he had no sensory deficit, and his strength was "5/5 in the upper and lower extremities."  (Id.)  Dr. Ali ultimately diagnosed O'Dell with intermittent neck pain but articulated no neck-related limitations on O'Dell's functioning.  (See R. 500-01.)

### Evidence Pertaining to O'Dell's Mental Impairments

#### Treating Physician Dr. Thomas Van Aken

O'Dell began visiting treating psychiatrist Dr. Thomas Van Aken on June 9, 2010. (R. 301.)  The record contains progress notes indicating that between June 9, 2010 and the alleged May 27, 2011 onset date of O'Dell's disability, Dr. Van Aken treated O'Dell for anxiety and depression.  (See R. 288-95, 300.)  Those notes also show that O'Dell's dosages of anxiety and depression medications remained relatively stable up to and during the disability period.  (See id.) A progress note from August 22, 2011, for example, states that there was no change in O'Dell's diagnosis or treatment plan, which included prescriptions for Xanax and Effexor.  (R. 291.)  An August 22, 2011 workers' compensation Doctor's Progress Report filled out by Dr. Van Aken states

that O'Dell was suffering from anxiety, depression and panic.  (R. 297-98.)  The report also states that O'Dell's most recent examination revealed "no change" in his condition, and that he was "still nervous and depressed, unable to function." (R. 298.)  Dr. Van Aken further opined that O'Dell was "unable to work for psychiatric issues"—namely, because he was "too nervous [and] depressed." (Id.)  In a letter also dated August 22, 2011, Dr. Van Aken opined that O'Dell "is unable to work due to his anxiety and depression" (R. 296), but provided no details on how O'Dell's anxiety and depression affect him on a day-to-day basis (see id.).

### Treating Physician Dr. Paul Schefflein

In a Primary Physician's Statement of Disability form dated December 10, 2011, Dr. Paul Schefflein stated that O'Dell presented with subjective complaints of anxiety and depression, and that he had been diagnosed with the same.  (R. 390-92.)  Dr. Schefflein also indicated that O'Dell's present condition was "of such nature as to permanently disable [him] from performing all the duties of his . . . present position" as a police officer, and that O'Dell's prognosis was "guarded." (R. 391.)

Dr. Schefflein also submitted a Medical Source Statement of Ability to Do Work Related Activities (Mental) form, dated November 6, 2012.  (R. 380-82.)  Dr. Schefflein indicated that O'Dell suffered from depression, anxiety and PTSD.  (R. 380-81.)  Dr. Schefflein opined that as a result of those conditions, O'Dell had no limitations in his ability to interact appropriately with the public, supervisors, or coworkers (R. 381); O'Dell had "slight"[13] limitations in his ability to

---

[13]     "Slight" is defined on the form as "some mild limitations in this area, but the individual can generally function well."  (R. 380.)

understand, remember, and carry out short, simple instructions (R. 380); and he had "moderate"[14] limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, make judgments on simple work-related decisions, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting (R. 380-81).

On January 27, 2014, Dr. Schefflein submitted a second Medical Source Statement of Ability to Do Work Related Activities (Mental).  (R. 519-21.)  Dr. Schefflein indicated that O'Dell suffered from "PTSD coupled [with] multiple medical [problems]."  (R. 519-20.)  Dr. Schefflein asserted that O'Dell had no limitations in his ability to understand, remember, and carry out simple instructions (R. 519); no limitations in his ability to interact appropriately with the public, supervisors and co-workers (R. 520); "mild"[15] limitations in his ability to make judgments on simple work-related decisions (R. 519); moderate limitations in his ability to understand and remember complex instructions (id.); moderate to "marked"[16] limitations in his ability to carry out complex instructions and make judgments on complex work-related decisions (id.); and marked limitations in his ability to respond appropriately to usual work situations and to changes in a routine work setting (R. 520).

**Examining Psychologist Dr. Amy S. Cohen**

On January 15, 2013, consultative psychiatrist Dr. Amy S. Cohen examined O'Dell

---

[14]    "Moderate" is defined on the form as "moderate limitation in this area but the individual is still able to function satisfactorily."  (R. 380.)

[15]    "Mild" is defined on the form as "slight limitation in this area, but the individual can generally function well."  (R. 519.)

[16]    "Marked" is defined on the form as "serious limitation in this area.  There is a substantial loss in the ability to effectively function."  (R. 519.)

in connection with his DIB application.  (R. 492-96.)  O'Dell reported that he was "currently unemployed due to unstable angina and PTSD."  (R. 492.)  He stated that he was having difficulty sleeping, and that he wakes up as much as three times a night.  (R. 493.)  He also told Dr. Cohen that "he has not been the same since" a motor vehicle accident that occurred while he was responding to a call as a police officer.  (Id.)  O'Dell reported that while working as a police officer, he was involved in a physical fight with another officer and was made to feel that his colleagues did not "'have [his] back.'"  (Id.)  O'Dell reported "increased feelings of paranoia and hatred," accompanied by "flashbacks and nightmares" of his accident and "dreams about being shot by another officer." (R. 493-94.)

   With regard to his activities of daily living, O'Dell reported to Dr. Cohen that he "cleans and does laundry once to twice a week, and shops once to four times a week."  (R. 495.)  He reported that he dressed, bathed and groomed himself on daily basis.  (Id.)  O'Dell stated that "[h]e watches TV, listens to the radio, goes out to restaurants and social clubs, socializes with friends, and volunteers for the EMS and fire department as Captain."  (Id.)

   Upon examination, Dr. Cohen found O'Dell to be "cooperative and well related," "adequately groomed," and "[c]oherent and goal directed with no evidence of hallucinations or delusions."  (R. 494.)  O'Dell's affect was "[d]epressed" and "hopeless."  (Id.)  Dr. Cohen assessed that O'Dell's attention, concentration and recent and remote memory skills were intact.  (R. 495.) She further opined that O'Dell's intellectual functioning was below average, but that his insight and judgment were good.  (Id.)  Based on her examination, Dr. Cohen concluded that:

> [O'Dell] can follow and understand simple directions.  He can perform simple tasks independently and with supervision.  He can maintain attention and concentration and learn new tasks.   [O'Dell] is capable of performing some complex tasks independently and with supervision.   He can make appropriate decisions.   He is having difficulty relating socially and he is very challenged in dealing with stress.

(Id.)  Dr. Cohen opined that this assessment "appear[s] to be consistent with psychiatric-related problems and these may significantly interfere with [O'Dell's] ability to function on a daily basis." (Id.)

Dr. Cohen ultimately diagnosed O'Dell with PTSD, "[m]ajor depressive disorder, severe, recurrent, without psychotic features," and "[a]cute stress disorder."  (R. 496.)  She stated that O'Dell's prognosis was "[g]uarded to fair," and recommended that O'Dell continue psychotherapy and psychotropic medication management.  (Id.)  She also opined that O'Dell required vocational training.  (Id.)

### Examining Psychiatrist Dr. Jeffrey H. Newton

On April 29, 2013, psychiatrist Dr. Jeffrey Newton examined O'Dell in connection with his application for police department retirement benefits.  (R. 531-39.)  The purpose of Dr. Newton's examination was to determine whether O'Dell's February 27, 2009 motor vehicle accident and October 3, 2010 altercation with a superior officer "were the competent producing cause of a posttraumatic stress disorder condition alleged to render [O'Dell] permanently disabled and unable to perform the duties of the position of Police Officer."  (R. 531.)  O'Dell reported that he was experiencing anxiety problems, daily panic attacks, left hand shaking, "'horrendous'" depression, and feelings of hopelessness and uselessness.  (Id.)  O'Dell also indicated that he had been engaging in impulsive behavior, such as getting "thirty-five tattoos since leaving the Department." (R. 532.)

As a result of Dr. Newton's examination of O'Dell and review of his medical records, Dr. Newton diagnosed O'Dell with generalized anxiety disorder.  (R. 538.)  Dr. Newton observed that O'Dell had "a history of anxiety and anxiety-related conditions going back well before his time" at the police department, and that by O'Dell's own report, "his anxiety problems did not prevent him

from functioning" as a police officer.  (Id.)  Dr. Newton disagreed with Dr. Schefflein's opinion that O'Dell's mental and physical disorders stemmed from the 2009 motor vehicle accident and/or the 2010 altercation.  (R. 538-39.)  Rather, Dr. Newton opined that O'Dell reported no "decrement in his performance as a police officer which might be attributed to" his 2009 accident, and that the 2010 altercation with his supervisor did not "so disrupt[] his psychological equilibrium as to render him unable to continue to function as a police officer."  (R. 539.)  Dr. Newton concluded that O'Dell "is not permanently disabled and unable to perform the duties of the position of police officer."  (Id.)

### Reviewing Medical Consultant Michelle Marks

On January 28, 2013, consultant Dr. Michelle Marks reviewed O'Dell's records and assessed his mental residual function capacity in connection with his DIB application.  (R. 72-75.)  Dr. Marks opined that O'Dell does not have understanding and memory limitations, but that he does have limitations in "sustained concentration and persistence."  (R. 72.)  She further opined that O'Dell was not significantly limited in his ability to carry out very short and simple instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions.  (R. 72-73.)  Dr. Marks assessed that O'Dell was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, respond appropriately to changes in a work setting, and to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period."  (R. 73.)  Dr. Marks concluded that O'Dell "did not handle stress well and was injured by stressful experiences on the job" (id.), but that O'Dell could "return to less stressful work" (R. 75).

**Vocational Expert Testimony**

Vocational expert Linda Stein testified at O'Dell's hearing.  (R. 58-62.)  ALJ Stacchini asked Stein to list possible jobs for a person of O'Dell's age, education, and work experience who is able to do the full range of light work, with the caveat that he should be allowed to alternate between sitting and standing every hour; he should not be required to climb ladders, and should be limited to only occasional climbing of ramps, stairs, ropes, scaffolds; he should be limited to only occasional balancing, stooping, kneeling, crouching, crawling, exposure to unprotected heights, and moving mechanical parts; he could engage in frequent reaching, handling, and fingering; he should be limited to a job that involves only "simple, routine tasks such as those demanded of SVP: 2 jobs or less,"[17] and "low stress" jobs defined as those involving only occasional decision making and changes in the workplace.  (R. 59.)  Stein opined that a person with those limitations could work as a ticket taker, cashier or information clerk.  (R. 59-60.)

ALJ Stacchini asked Stein to consider a second hypothetical person with the same limitations discussed above, but with the added limitation that the person be capable of performing only sedentary work.  (R. 60.)  Stein responded that such a person would be capable of working as a surveillance system monitor, a telephone order clerk ("like for room service") and an information clerk.  (R. 60-61.)  Lastly, ALJ Stacchini asked Stein to assume the same limitations as the second

---

[17]     "SVP," which stands for specific vocational preparation, "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, Dictionary of Occupational Titles Appendix C (4th ed. 1991), available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited Nov. 22, 2016).  An SVP of two corresponds to unskilled work, see SSR 00-4p, 2000 WL 1898704 at *3 (Dec. 4, 2000), requiring more than a "short demonstration up to and including 1 month" of vocational training, U.S. Dep't of Labor, Dictionary of Occupational Titles Appendix C (4th ed. 1991), available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited Nov. 22, 2016).

hypothetical, but with the caveat that the person be permitted to be off task for twenty percent of the work period in addition to regularly scheduled breaks.  (R. 61.)  Stein opined that such a person could not work any jobs.  (Id.)

**ALJ Stacchini's Decision**

On June 20, 2014, ALJ Stacchini denied O'Dell's application for benefits.  (R. 9-22.)  ALJ Stacchini applied the appropriate five step legal analysis.  (R. 12-14.)  First, he found that O'Dell "has not engaged in substantial gainful activity since May 27, 2011, the amended alleged onset date."  (R. 14.)  Second, ALJ Stacchini found that O'Dell had "the following severe impairments: depressive disorder; anxiety disorder; PTSD; angina; hypertension; neck subluxation; hyperkyphosis; and degenerative joint disease of the cervical and thoracic spines." (Id.)  Third, ALJ Stacchini found that O'Dell did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."  (R. 14-15.)  ALJ Stacchini specifically addressed O'Dell's mental impairments, concluding that those impairments were not severe based on O'Dell's activities of daily living, the opinion of Dr. Cohen, and O'Dell's lack of reported episodes of decompensation, a residual disease process resulting in marginal adjustment, or a history of one or more years' inability to function outside a highly supportive living arrangement.  (R. 15.)

ALJ Stacchini determined that O'Dell had the residual function capacity ("RFC") to

perform light work as defined in 20 CFR 404.1567(b).  [O'Dell] . . . needs to alternate sitting and standing at one hour intervals throughout the day.  He is able to occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  He is able to occasionally balance, stoop, kneel, crouch, and crawl; frequently reach, handle, and finger with the left [hand]; and occasionally work from unprotected heights, and [with] moving mechanical parts.  He is limited to simple routine tasks such as those demanded of SVP 2 jobs or less in a low stress job defined as having only occasional decision making and changes in the work place.

(R. 15-16.)

ALJ Stacchini accorded "little" weight to Dr. Van Akan's opinion that O'Dell was unable to work due to his nervousness and depression. (R. 16.) ALJ Stacchini stated that Dr. Van Akan's opinion was "conclusory" and "not supported by Dr. Van Akan's own treatment notes, indicating a conservative treatment and various activities of daily living." (Id.) On the other hand, ALJ Stacchini gave "great" weight to Dr. Schefflein's opinion that O'Dell's mental impairments produced moderate to marked limitations in only some areas of mental functioning. (R. 17.) ALJ Stacchini observed that Dr. Schefflein was a treating source, and that his opinion was consistent with his treatment notes in the record. (Id.) ALJ Stacchini similarly accorded "great" weight to Dr. Cohen's opinion that O'Dell had problems dealing with stress because she examined O'Dell and her opinion was supported by the clinical findings made during her examination. (Id.) He gave only "some" weight to Dr. Newton's opinion that O'Dell was not disabled because the record demonstrated that O'Dell was physically unable to perform the duties of a police officer. (R. 18.) ALJ Stacchini provided "significant" weight to Dr. Marks' opinion regarding O'Dell's moderate mental function limitations because she reviewed the record, and because her opinion was consistent with Dr. Schefflein's. (Id.)

With regard to O'Dell's physical limitations, ALJ Stacchini accorded "little" weight to Dr. Choudhry's opinion that O'Dell's angina rendered him totally and permanently disabled because that opinion was inconsistent with O'Dell's activities of daily living, his conservative course of treatment, and with the opinion of reviewing physician Dr. Halprin. (R. 19.) ALJ Stacchini noted, however, that Dr. Choudhry's opinion that O'Dell was totally disabled appeared to be directed at O'Dell's past work as a police officer. (Id.) ALJ Stacchini provided only "some" weight to Dr. Auerbach's opinion that O'Dell's angina did not significantly impact his RFC because that opinion

was not supported by a physical examination of O'Dell, and because Dr. Auerbach did not define "significant impact."  (R. 17.)  He provided "some" weight to Dr. Ali's opinion that O'Dell's angina produced no functional limitations on O'Dell's ability to work because the record indicated that it was unlikely that O'Dell could sustain medium work.  (R. 18.)  He also provided "some" weight to Dr. Halprin's opinion regarding the origin of O'Dell's chest pain, noting that opinion did not include any functional limitations on O'Dell's ability to work.  (R. 18-19.)  ALJ Stacchini gave "little" weight to Dr. Malouf's estimates of the functional limitations stemming from O'Dell's neck pain because that opinion was inconsistent with O'Dell's activities of daily living and conservative treatment history.  (R. 19.)

ALJ Stacchini also concluded that O'Dell's "statements concerning the intensity, persistence and limiting effects" of his impairments, including neck pain, angina, and PTSD, were "not entirely credible."  (R. 16.)  He supported this credibility determination with a review of the medical evidence of record, as well as O'Dell's own testimony regarding his daily activities and volunteer work.  (R. 16-20.)

At the fourth step, ALJ Stacchini determined that O'Dell's RFC precluded his past relevant work as an EMT or police officer, but that given O'Dell's "age, education, work experience and residual functional capacity," jobs "exist in significant numbers in the national economy" that he can perform.  (R. 20-21.)  ALJ Stacchini noted that O'Dell is considered a younger individual with a high school education and able to communicate in English.  (R. 20.)  ALJ Stacchini relied on vocational expert Stein's testimony that a person with these characteristics and limitations could work as a ticket taker, cashier or information clerk.  (R. 21.)  Accordingly, ALJ Stacchini concluded that O'Dell was not "under a disability, as defined in the Social Security Act, from May 27, 2011" through June 20, 2014.  (Id.)

## ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[18/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S.

---

[18/]   See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270.[19]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[20]

**B.     Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. <u>E.g.</u>, 42 U.S.C. § 405(g); <u>Giunta</u> v. <u>Comm'r of Soc. Sec.</u>, 440 F. App'x 53, 53 (2d Cir. 2011).[21]   "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

_____

[19]     See also, e.g., <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

[20]     See, e.g., <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62.

[21]     See also, e.g., <u>Prince</u> v. <u>Astrue</u>, 514 F. App'x 18, 19 (2d Cir. 2013); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 551 U.S. 1132, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[22]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[23] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[24]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[22] See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[23] See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[24] See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[25]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See,

---

[25]  Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[26/]

## C.    **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner

in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.

Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700

(2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254

F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant.  20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[26/]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Cir. 2013); <u>Gunter</u> v. <u>Comm'r of Soc. Sec.</u>, 361 F. App'x 197, 197 (2d Cir. 2010).[27/]

       When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." <u>Snell</u> v. <u>Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999); <u>see</u>, <u>e.g.</u>, <u>Cichocki</u> v. <u>Astrue</u>, 534 F. App'x at 75; <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to <u>Snell</u> but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); <u>Ferraris</u> v. <u>Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); <u>Ramos</u> v. <u>Barnhart</u>, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

       The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).

---

[27/]    See also, <u>e.g.</u>, <u>Foxman</u> v. <u>Barnhart</u>, 157 F. App'x 344, 346-47 (2d Cir. 2005); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Clark</u> v. <u>Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 503 (2d Cir. 1998).

## II.  APPLICATION OF THE FIVE STEP SEQUENCE

### A.  O'Dell Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether O'Dell was engaged in substantial gainful activity after his application for DIB.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  ALJ Stacchini's conclusion that O'Dell did not engage in substantial gainful activity during the applicable time period (see page 21 above) is not disputed.  (See generally Dkt. No. 28: Comm'r Br.)  The Court therefore proceeds with the analysis.

### B.  O'Dell Demonstrated "Severe" Impairments That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether O'Dell proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).

ALJ Stacchini determined that O'Dell's severe impairments were depressive disorder, anxiety disorder, PTSD, angina, hypertension, neck subluxation, hyperkyphosis, and degenerative joint disease of the cervical and thoracic spines.  (See page 21 above.)  ALJ Stacchini's findings regarding the step-two severity of these impairments benefit O'Dell, and O'Dell does not contest

those findings.  (See Dkt. No. 24: O'Dell Br. ¶ 4.)  Accordingly, the Court proceeds to the third step of the five-part analysis.

**C.      O'Dell Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether O'Dell had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Stacchini found that notwithstanding O'Dell's severe impairments, he "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  (R. 14.)  ALJ Stacchini compared the medical evidence in the record to the criteria in listings 1.04 (disorders of the spine), 4.00 (cardiovascular system), 12.04 (affective disorders), and 12.06 (anxiety related disorders).[28/]  (R. 14; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.04, 4.00, 12.04, 12.06.)  O'Dell's counsel argues that the Commissioner erred by "accepting the findings that Mr. O'Dell's impairments did not exceed or  meet the listing of impairments" (Dkt. No.

---

[28/]      Beginning on January 17, 2017, PTSD will be evaluated under (new) listing 12.15.  See 81 FR 66138, 2016 WL 5507752 at *1 (Sept. 26, 2016); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(B)(11), 12.15 (text of section 12.00 effective on Jan. 17, 2017).  Because listing 12.15 is not yet in effect, and because O'Dell does not object to ALJ Stacchini's evaluation of his PTSD under the presently appropriate 12.06, the Court does not discuss the standards in 12.15.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(11); Bittles v. Astrue, 777 F. Supp. 2d 663, 666 (S.D.N.Y. 2011) ("To meet the required level of severity for PTSD, a claimant must provide medical documentation for the criteria listed in Section 12.06(A) and Section 12.06(B).").

24: O'Dell Br. ¶ 5), but he fails to state which listings were inappropriately analyzed by ALJ Stacchini.  (See generally O'Dell Br. ¶¶ 6-17.)  The Court reviews the four listings addressed by ALJ Stacchini.

### 1.    Disorders of the Spine

For a disorder of the spine to be considered severe it must result "in compromise of a nerve root (including the cauda equina) or the spinal cord" with:

> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

ALJ Stacchini's finding that O'Dell's neck subluxation, hyperkyphosis, and degenerative joint disease of the cervical and thoracic spines did not meet or equal a listed impairment is supported by Dr. Ali's examination of O'Dell, which showed full range of motion in his spine and neither sensory nor reflex loss (see page 14 above), as is required to satisfy listing 1.04(A).  Although Dr. Malouf reported in 2014 that O'Dell exhibited asymmetrical reflexes (see page 12 above) and the diagnostic testing conducted in 2014 indicated some abnormalities in O'Dell's cervical and thoracic spine (see page 13 above), O'Dell's June 11, 2014 x-rays revealed that the motion of his spine remains within normal limits (see id.).  Accordingly, substantial evidence

supports ALJ Stacchini's determination that O'Dell did not meet the criteria in listing 1.04(A).

Similarly, there is no operative note, pathology report of tissue biopsy, or appropriate medically acceptable imaging in the record to support a finding of spinal arachnoiditis as is required to satisfy listing 1.04(B).  Listing 1.04(C) requires an inability to ambulate effectively.

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).  O'Dell's ability to ambulate effectively is demonstrated by his numerous cardiac stress tests, which involved running on a treadmill (see, e.g., R. 353) and by the fact that he does not use an assistive device (see page 14 above).

Thus, substantial evidence supported ALJ Stacchini's conclusion that O'Dell's spinal disorders did not satisfy the requirements of listing 1.04.

### 2.      Cardiovascular Systems: Angina and Hypertension

The record indicates that O'Dell was diagnosed with Prinzmetal's angina. Prinzmetal's angina is classified as "variant angina."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04(E)(6)(a).  Variant angina occurring in relation to an obstructive lesion constitutes a disabling impairment if it meets the criteria in listing 4.04.  See id.  As Dr. Auerbach noted, however, O'Dell's December 2010 cardiac catheterization test "only demonstrated a discrete 20%, nonobstructive, lesion in the proximal LAD" of his heart.  (R. 490, emphasis added.)  Similarly, under Appendix 1, a claimant exhibiting "an arrhythmia as a result of variant angina" will be considered disabled if he or she meets the criteria in listing 4.05.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04(E)(6)(a).  Dr. Ali's January 15, 2013 examination of O'Dell revealed no arrhythmia.  (R.499.)  Dr. Halprin noted

that O'Dell's October 2010 cardiac stress test was either equivocal or negative (see page 9 above), that same stress test indicated "normal sinus rhythm" (R. 344), and that all of O'Dell's electrocardiograms documented in the record were within normal limits (see pages 9-10 above).  Dr. Choudhry similarly concluded that the stress test performed in May 2012 was negative.  (See page 6 above.)  Dr. Auerbach observed that O'Dell's "stress tests have been negative," and that his "[e]chocardiograms have been normal."  (See page 9 above.)  In sum, none of O'Dell's treating, examining, or reviewing physicians diagnosed him with an obstructive lesion or arrhythmia.  (See pages 5-10 above.)

ALJ Stacchini was entitled to rely on the absence of such diagnoses in finding that O'Dell's angina did not satisfy listings 4.04 or 4.05.  See, e.g., Salvaggio v. Apfel, 23 F. App'x 49, 51 (2d Cir. 2001) (lack of medical evidence supports the ALJ's determination that plaintiff was not disabled); O'Connor v. Shalala, No. 96-6215, 111 F.3d 123 (table), 1997 WL 165381 at *1 (2d Cir. Mar. 31, 1997) ("[T]he Commissioner is also entitled to rely on the absence of contemporaneous evidence of the disability."); Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (Commissioner is "entitled to rely not only on what the [medical] record says, but also on what it does not say"); Rodriguez v. Colvin, 15 Civ. 8390, 2016 WL 1178780 at *10 (S.D.N.Y. Mar. 25, 2016) (Peck, M.J.); Soto v. Colvin, 14 Civ. 7440, 2015 WL 1726541 at *19 (S.D.N.Y. Apr. 14, 2015) (Peck, M.J.) (The ALJ "was entitled to rely on that absence of evidence"); Johnston v. Colvin, 13 Civ. 2710, 2015 WL 657774 at *5 n.3 (S.D.N.Y. Feb. 13, 2015) ("As the Second Circuit has noted, the absence of evidence from the claimed period of disability may itself be considered substantial evidence."), R. & R. adopted, 2015 WL 1266895

(S.D.N.Y. Mar. 18, 2015).[29]

In the absence of an obstructive lesion or arrhythmia, Prinzmetal's angina is not automatically disabling and the SSA instead "consider[s] the frequency of anginal episodes despite prescribed treatment when evaluating your residual functional capacity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04(E)(6)(b). As discussed below, ALJ Stacchini appropriately accounted for O'Dell's anginal episodes in his RFC assessment. (See pages 47-48 below.) Accordingly, substantial evidence supports ALJ Stacchini's conclusion that O'Dell's angina did not meet the criteria for any automatically disabling Appendix 1 impairments.[30]

Appendix 1 states the following with regard to hypertension:

Because hypertension (high blood pressure) generally causes disability through its effects on other body systems, we will evaluate it by reference to the specific body system(s) affected (heart, brain, kidneys, or eyes) when we consider its effects under the listings. We will also consider any limitations imposed by your hypertension when we assess your residual functional capacity.

---

[29] See also, e.g., Marte v. Colvin, 14 Civ. 0832, 2014 WL 5088078 at *18 (S.D.N.Y. Oct. 9, 2014) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Catrain v. Barnhart, 325 F. Supp. 2d 183, 192 (E.D.N.Y. 2004) ("[T]he ALJ is entitled to rely on the absence of opinions. . . ."); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *13 (S.D.N.Y. July 8, 2003) (Peck, M.J.), R. & R. adopted, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *13 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Alvarez v. Barnhart, 02 Civ. 3121, 2002 WL 31663570 at *10 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), R. & R. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003).

[30] O'Dell argues it is "significant[]" that a SPECT scan conducted in October 2010 revealed that his left ventricular ejection fraction was 54 percent. (Dkt. No. 24: O'Dell Br. ¶ 6.) According to the Mayo Clinic, however, a left ventricular ejection fraction of 55 percent or higher is considered normal. See Mayo Clinic, Ejection Fraction: What does it measure? (February 11, 2016), available at http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286 (last visited Nov. 22, 2016). In any event, Appendix 1 listing 4.02 states that only an ejection fraction of 30 percent or less satisfies the paragraph A criteria for chronic heart failure, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02(A)(1), and O'Dell makes no argument regarding the paragraph B criteria for that impairment (see generally O'Dell Br. ¶¶ 6-17).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04(H).  Because the record contains no evidence suggesting that O'Dell's hypertension causes disability through its effects on his other body systems—including, as already discussed, his heart—ALJ Stacchini's determination that O'Dell's hypertension does not meet the any of the impairments in the Listings is supported by substantial evidence.

### 3.      Mental Impairments

With regard to mental impairments, the SSA "will find that [a claimant] ha[s] a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).  To satisfy paragraph B under listing 12.04 or 12.06, O'Dell must show at least two of the following:

> 1.  Marked restriction of activities of daily living; or
>
> 2.  Marked difficulties in maintaining social functioning; or
>
> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B).

ALJ Stacchini found that O'Dell had only mild restrictions in activities of daily living, which include cooking, cleaning, laundry, shopping, and performing personal hygiene on a daily basis.  (See page 2-3 above.)  ALJ Stacchini observed that although consultative psychiatrist Dr. Cohen assessed that O'Dell was having difficulty relating socially (see page 17 above), O'Dell nevertheless testified that he goes out to restaurants, spends time with friends, and belongs to social clubs (see pages 2-3, 5, 17 above).  ALJ Stacchini thus concluded that O'Dell only had mild difficulties with social functioning.  ALJ Stacchini also noted Dr. Cohen's opinion that O'Dell was challenged in dealing with stress (see page 17 above), but found that such stress produced, at most,

only moderate limitations in O'Dell's ability to maintain concentration, persistence and pace.  (R. 15.)  Finally, ALJ Stacchini appropriately observed that the record contains no evidence that O'Dell had suffered episodes of decompensation of extended duration.  (See page 21 above.)  These conclusions are supported by the opinions of Drs. Schefflein and Marks, neither of whom assessed more than a moderate limitation in any of the above-discussed areas of functioning.  (See pages 15-16, 19 above.)

> To satisfy paragraph C under listing 12.04, O'Dell must show:
>
> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1.  Repeated episodes of decompensation, each of extended duration; or
>
> 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).  Under listing 12.06, paragraph C requires O'Dell to demonstrate that his anxiety has "[r]esult[ed] in complete inability to function independently outside the area of [his] home."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C).

ALJ Stacchini appropriately determined that the record contains no evidence that O'Dell suffered episodes of decompensation.  (See pages 14-19 above.)  Moreover, although Dr. Schefflein opined that O'Dell had marked limitations in his ability to respond appropriately to changes in a routine work setting (see page 16 above), none of O'Dell's treating, examining, or reviewing psychiatrists asserted that changes in environment would cause O'Dell to decompensate

(see pages 14-19 above).  Finally, the record evidence regarding O'Dell's activities of daily living indicates that he maintained the ability to function outside of a highly supportive environment, and that he did not have a complete inability to function independently outside the area of his home. (See pages 2-3, 5, 17 above.) Thus, substantial evidence supports ALJ Stacchini's determination that O'Dell did not meet the paragraph C criteria for listings 12.04 and 12.06.  (R. 15.)

Accordingly, ALJ Stacchini's finding that O'Dell did not have a listed disability was supported by substantial evidence.

### D.   **Credibility And Residual Functional Capacity Determinations**

Before proceeding to step four, the Court will address ALJ Stacchini's credibility and residual functional capacity ("RFC") determinations.

### 1.   **Credibility Determination**

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence."  Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints

without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'").[31/]  In addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[32/]

      ALJ Stacchini determined that O'Dell's "medically determinable impairments could

---

[31/]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[32/]    Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

reasonably be expected to cause" his alleged symptoms, but that his "statements concerning the intensity, persistence and limiting effects of [those] symptoms [were] not entirely credible."  (See page 23 above.)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[33]

ALJ Stacchini appropriately applied this two-step process, supporting his credibility determination with a review of O'Dell's testimony regarding his activities of daily living and volunteer work, the magnitude of treatment O'Dell received for his physical and metal impairments, and information in the record regarding the alleged onset date of O'Dell's impairments.  (R. 19-20.)  ALJ Stacchini found, for example, that O'Dell "described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (R. 19.)

---

[33]   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

This finding is supported by substantial evidence, as O'Dell's assertions of back and neck pain, unstable angina, depression and anxiety sufficiently severe to render him completely unable to work are inconsistent with his statements that he does chores, including laundry and cooking, that he drives to stores and shops for himself, that he spends time with friends at restaurants, and that he takes care of his own hygiene.  (See pages 2-3, 5, 17 above.)  The Court also notes that O'Dell's testimony that he has "a very hard time in large crowds" due to his anxiety (R. 44) is contradicted by his statement that he attends sporting events (see page 2 above).

ALJ Stacchini also noted that O'Dell had not sought or received treatment commensurate with the alleged severity of his impairments.  Although the record indicates that O'Dell saw Dr. Choudhry on numerous occasions following episodes of angina (see pages 5-6 above), and that O'Dell occasionally sought chiropractic treatment from Dr. Malouf (see page 11 above), there is no evidence of hospitalizations, emergency room visits, or surgeries related to his physical impairments (see pages 2-14 above).  The record likewise indicates that O'Dell responded well to medication.  He reported to Dr. Ali, for example, that the nitroglycerine he takes in response to an angina episode alleviates his symptoms within a few minutes (see page 8 above); Dr. Van Aken's progress notes indicate that O'Dell's depression and anxiety medication dosages remained relatively consistent during the relevant period (see page 14 above); and O'Dell testified that he was relying on over-the-counter ibuprofen to manage his neck and back pain (see page 5 above).

Finally, ALJ Stacchini observed several inconsistencies with regard to the onset date of O'Dell's allegedly disabling pain.  O'Dell asserted that he was disabled and completely unable to work beginning in May 2011 (see page 2 above), but he also testified that he continued to do volunteer work at the fire department and an ambulance company until January 1, 2014 (see page

3 above).[34/]  O'Dell's assertion that his back and neck pain recently became disabling is inconsistent with Dr. Malouf's statements that the injury purportedly giving rise to O'Dell's pain occurred in 2007, that O'Dell only saw Dr. Malouf for chiropractic treatment beginning in 2011, and that the frequency of O'Dell's visits to Dr. Malouf actually decreased in 2012—the year following the alleged onset of his disability (see pages 10-11 above).  The fact that O'Dell only sought chiropractic treatment from Dr. Malouf twice in 2013 (see page 11 above) likewise undermines O'Dell's testimony that his back pain increased from a mere "uncomfortable feeling" that he rated as a one or two on a ten-point scale, as he told Dr. Ali on January 15, 2013 (see page 14 above), to a three or four on a ten-point scale as he testified at his hearing before ALJ Stacchini on February 27, 2014 (see page 4-5 above).

Thus, ALJ Stacchini met his burden in finding O'Dell's claims not entirely credible because the objective medical evidence and O'Dell's own testimony failed to support his claims of disability.  See, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Duran v. Colvin, 14 Civ. 4681, 2015 WL 4476165 at *13 (S.D.N.Y. July 22, 2015) (Peck, M.J.) (the ALJ "met his burden in finding [plaintiff] not entirely credible because the

---

[34/]    This fact also belies O'Dell's argument that "[p]lacing [him] . . . into the work environment triggers chest pain." (Dkt. No. 24: O'Dell's Br. ¶ 12.)  Although O'Dell testified that he ultimately stopped his volunteer work because "it was more than [he] could handle" (see page 3 above), no evidence in the record supports the assertion that O'Dell's angina is automatically triggered when he is placed in any type of work environment for any length of time (see pages 2-10 above).

objective medical evidence and her stated independence in activities of daily living failed to support her claims of disability"); Kessler v. Colvin, 48 F. Supp. 3d 578, 596 (S.D.N.Y. 2014) (claimant's "subjective complaints of pain lacked the necessary objective medical support, and therefore were not entitled to any special weight.  Accordingly, the ALJ's adverse credibility determination was not erroneous."); Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10-11 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.) (ALJ properly found claimant's disability claims not entirely credible where claimant "admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church"); Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (the ALJ "met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain" (citations omitted)); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("[I]n making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations."), R. & R. adopted, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

## 2.    **Residual Functional Capacity Determination**

ALJ Stacchini found that O'Dell had the RFC to "perform light work as defined in 20 CFR 404.1567(b)," except that he

> needs to alternate sitting and standing at one hour intervals throughout the day.  He is able to occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  He is able to occasionally balance, stoop, kneel, crouch, and crawl; frequently reach, handle, and finger with the left; and occasionally work from unprotected heights, and [with] moving mechanical parts.  He is limited to simple routine tasks such as those demanded of SVP 2 jobs or less in a low stress job defined as having only occasional decision making and changes in the work place.

(See page 21 above.)  Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds.  Even though the weight lifted may be very little,
> a job is in this category when it requires a good deal of walking or standing, or when
> it involves sitting most of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a full or wide range of light work,
> you must have the ability to do substantially all of these activities.  If someone can
> do light work, we determine that he or she can also do sedentary work, unless there
> are additional limiting factors such as loss of fine dexterity or inability to sit for long
> periods of time.

20 C.F.R. § 404.1567(b).

ALJ Stacchini's RFC determination was based on his review of O'Dell's testimony and the medical evidence.  (R. 16-20.)  With regard to the limiting effects of O'Dell's mental impairments, ALJ Stacchini credited the opinions of Drs. Schefflein and Marks, both of whom assessed that O'Dell exhibited moderate to marked difficulties in his ability to carry out detailed instructions and respond appropriately to changes in a routine work setting.  (See pages 16, 19 above.)  ALJ Stacchini observed that these opinions were consistent both with each other and with the evidence of record (see page 22 above); he accorded Dr. Schefflein's opinion "great" weight partly because he was a treating source (see id.).  ALJ Stacchini also accorded "great" weight to the opinion of Dr. Cohen, who concluded based on the clinical findings made during her in-person examination of O'Dell that he was having difficulty dealing with stress.  (See id.)  Dr. Cohen's opinion regarding O'Dell's difficulty with stress also is supported by Dr. Marks' assessment to the same effect (see pages 17, 19 above), and ALJ Stacchini's assessment of O'Dell's mental RFC is consistent with Dr. Schefflein's opinion that O'Dell's mental impairments precluded him from working as a police officer (see page 15 below).

The medical opinions in the record, however, also indicate that O'Dell's mental limitations were not work preclusive.  Dr. Schefflein opined that O'Dell suffered no limitations in

his ability to understand, remember and carry out simple instructions; no limitations in his ability to interact appropriately with the public, supervisors and co-workers; and that he had only "mild" limitations in his ability to make judgments on simple work-related decisions.  (See pages 15-16 above.)  Dr. Cohen similarly assessed that O'Dell

> can follow and understand simple directions.  He can perform simple tasks independently and with supervision.  He can maintain attention and concentration and learn new tasks.  The claimant is capable of performing some complex tasks independently and with supervision.  He can make appropriate decisions.

(R. 495.)  Dr. Marks opined that O'Dell did not have understanding and memory limitations, was not significantly limited in his ability to carry out short and simple instructions and was able to perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them and to make simple work-related decisions.  (See page 19 above.)

Accordingly, ALJ Stacchini's determination that O'Dell was "limited to simple routine tasks such as those demanded of SVP 2 jobs or less in a low stress job defined as having only occasional decision making and changes in the work place" (R. 16) is supported by substantial evidence.

The Court notes that ALJ Stacchini appropriately applied the treating physician rule with regard to Dr. Van Akan's opinion that O'Dell was "unable to work due to his anxiety and depression," to which ALJ Stacchini accorded "little" weight.  (See pages 15, 22 above.)  The applicable regulations state that the SSA "will always give good reasons in [the] notice of determination or decision for the weight [the SSA] give[s] [the] treating source's opinion."  20 C.F.R. § 404.1527(c)(2); see also, e.g., Duran v. Colvin, 14 Civ. 4681, 2015 WL 4476165 at *8 (S.D.N.Y. July 22, 2015) (Peck, M.J.) (quoting Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (the

claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not.")).  "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable.  A claimant . . . who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  Snell v. Apfel, 177 F.3d at 133.  "While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); see, e.g., Price v. Comm'r of Soc. Sec., 14 Civ. 9164, 2016 WL 1271501 at *4 (S.D.N.Y. Mar. 31, 2016) ("The ALJ remains free to discount the views of a treating physician if it is inconsistent with substantial evidence.").

ALJ Stacchini observed that Dr. Van Aken's opinion is "conclusory."  (See page 22 above.)  Dr. Van Aken's conclusion regarding O'Dell's ability to work is not accompanied by any assessment of how O'Dell's mental impairments affect him on a day-to-day basis.  (See page 15 above.)  Furthermore, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," Mack v. Comm'r of Soc. Sec., 12 Civ. 0186, 2013 WL 5425730 at *8 (S.D.N.Y. Sept. 27, 2013), since such statements are not medical opinions, but rather "opinions on issues reserved to the Commissioner."  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).[35/]

---

[35/]    See also, e.g., Roma v. Astrue, 468 F. App'x 16, 18 (2d Cir. 2012); Priel v. Astrue, 453 F.
(continued...)

ALJ Stacchini also explained that Dr. Van Aken's assessment of O'Dell's ability to work was contradicted by "Dr. Van Aken's own treatment notes, indicating conservative treatment." (R. 16.)  Indeed, Dr. Van Aken's notes indicate appointments occurring only once every two to four weeks, no changes in treatment protocol, and only occasional, minor changes in medication dosage. (See pages 14-15 above.)  ALJ Stacchini's explanation is sufficient to satisfy the requirement that an ALJ provide a specific rationale for rejecting a treating physician's opinion.  See, e.g., Heitz v. Comm'r of Soc. Sec., 15 Civ. 3456, 2016 WL 4384350 at *7 (S.D.N.Y. Aug. 17, 2016) ("ALJ articulated specific reasons why she concluded the opinion to be both internally inconsistent and unsupported by the medical evidence, while providing specific examples of both."); Torres v. Comm'r of Soc. Sec., 15 Civ. 1382, 2016 WL 3911980 at *10 (S.D.N.Y. July 15, 2016); Them v. Colvin, 14 Civ. 7580, 2015 WL 10635499 at *12 (S.D.N.Y. Dec. 22, 2015).

With regard to O'Dell's physical impairments, ALJ Stacchini credited the opinion of Dr. Ali, who concluded that O'Dell's heart and spine-related impairments did not impose any functional limitations on O'Dell's ability to work other than "avoid[ing] activities requiring moderate exertion or greater secondary to angina."[36/]  (See pages 8-9, 14 above.)  ALJ Stacchini noted that Dr. Ali's opinion was consistent with the results of his in-person examination of O'Dell, which revealed

---

[35/]   (...continued)
App'x 84, 86 (2d Cir. 2011); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *17 (S.D.N.Y. July 2, 2013) (Peck, M.J.), R. & R. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014).

[36/]   As discussed above (see page 21 above), ALJ Stacchini determined that O'Dell maintains the RFC to perform only light work and that he is limited to low stress jobs.  Because ALJ Stacchini both cited Dr. Ali's opinion and accorded that opinion "some" weight in making this determination, the Court rejects O'Dell's argument that ALJ Stacchini "failed to fully consider" Dr. Ali's opinion that O'Dell was precluded from "activities of moderate or greater exertion or stressful activities secondary to angina."  (Dkt. No. 24: O'Dell's Br. ¶ 7.)

no cardiac abnormalities and full range of motion of the spine, normal reflexes and "5/5 strength" in his upper and lower extremities.  (See id.)  ALJ Stacchini nevertheless rejected Dr. Ali's assessment that O'Dell could sustain "medium" work as inconsistent with the record.[37/]  (See page 23 above.)  The Court notes that Dr. Ali's assessment is consistent with that of Dr. Auerbach, who concluded based on a review of O'Dell's medical records that O'Dell's angina did not have a "significant impact" on his RFC.  (See page 9 above.)  ALJ Stacchini also gave "some" weight to the opinion of Dr. Halprin, who stated that O'Dell's electrocardiograms and cardiac stress tests were either inconclusive or negative.  (See page 23 above.)  Taken together, these opinions provide sufficient support for ALJ Stacchini's conclusion that O'Dell could perform light work.

ALJ Stacchini also properly applied the treating physician rule with respect to Dr. Choudhry.  ALJ Stacchini accorded "little" weight to Dr. Choudhry's opinion that O'Dell's angina rendered him "'totally and permanently disabled,'" finding that the opinion "is inconsistent with the claimant's reported activities of daily living, conservative treatment, and the statement of" Dr. Halprin. (R. 19.)  This finding was supported by, inter alia, O'Dell's testimony that he continued his volunteer work with the fire department and ambulance company until January 2014 (see page 3 above), long after the October 2010 onset of his angina attacks (see page 4 above).  ALJ Stacchini's explanation was therefore sufficient to satisfy the requirement that an ALJ provide a specific rationale for rejecting a treating physician's opinion.  See, e.g., Heitz v. Comm'r of Soc. Sec., 15 Civ. 3456, 2016 WL 4384350 at *7 (S.D.N.Y. Aug. 17, 2016).

Notably, Dr. Malouf opined that O'Dell's spinal disorder rendered him unable to work.  (See page 12 above.)  ALJ Stacchini, however, was not required to defer to that opinion

---

[37/]    "Medium" work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).

because Dr. Malouf—a chiropractor—is not considered an "acceptable medical source" entitled to deference as a "treating source" under SSA regulations.  See 20 C.F.R. §§ 404.1513(a), (d)(1), 404.1527(a)(2); Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) ("According to Social Security Ruling 06-3p, 'only "acceptable medical sources" can be considered treating sources . . . whose medical opinions may be entitled to controlling weight.'").[38/]

Rather, ALJ Stacchini was required to assign Dr. Malouf's opinion an appropriate weight based on consideration of the factors set forth in 20 C.F.R. § 416.927(c).  See, e.g., SSR 06-3p, 2006 WL 2329939 at *4 (Aug. 9, 2006) ("Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'"); Rivera v. Colvin, 13 Civ. 7150, 2015 WL 1027163 at *15 (S.D.N.Y. Mar. 9, 2015) ("Because [a nurse practitioner] was properly classified as an 'other source,' the ALJ was not required to give her opinion controlling weight after applying the factors listed in 20 C.F.R. § 416.927."); Carter v. Astrue, 11 Civ. 2517, 2013 WL 1499414 at *16 (S.D.N.Y. Jan. 22, 2013), R. & R. adopted, 2013 WL 1499423 (S.D.N.Y. Apr. 10, 2013).

Among the factors to be considered under 20 C.F.R. § 416.927(c) is the opinion's consistency with the record as a whole.  20 C.F.R. § 416.927(c)(4); Browne v. Comm'r of Soc. Sec., 131 F. Supp. 3d 89, 98 (S.D.N.Y. 2015) ("When assessing how much weight to give [an] opinion,

---

[38/]    See also, e.g., Miller v. Astrue, 538 F. Supp. 2d 641, 650 (S.D.N.Y. 2008) ("[T]he ALJ is not required to give controlling weight to the opinion of a treating chiropractor because chiropractors are not acceptable medical sources according to Social Security law."); Downey v. Barnhart, 294 F. Supp. 2d 495, 498 n.3 (S.D.N.Y. 2003); Petrovic v. Comm'r of Soc. Sec., 15 Civ. 2194, 2016 WL 6084069 at *12 (S.D.N.Y. Aug. 25, 2016), R. & R. adopted, 2016 WL 6082038 (S.D.N.Y. Oct. 14, 2016); Bailey v. Comm'r of Soc. Sec., 14 Civ. 8454, 2016 WL 270453 at *5 (S.D.N.Y. Jan. 21, 2016), appeal dismissed (June 3, 2016).

the ALJ should consider factors set forth in the Commissioner's regulations, which include . . . the consistency of the opinion with the record as a whole."); Rivera v. Colvin, 2015 WL 1027163 at *15 n.15 (noting that the § 416.927(c) factors include "how consistent the opinion is with the other evidence of record").  Applying that factor, ALJ Stacchini concluded that Dr. Malouf's opinions regarding O'Dell's functional limitations were inconsistent with O'Dell's reported activities of daily living and conservative treatment history.  (See page 23 above.)  ALJ Stacchini's determination is additionally supported by the fact that the injury giving rise to O'Dell's spinal problems occurred in 2007.  (See pages 10-11 above.)  Neither O'Dell nor Dr. Malouf, however, reported indicia of a disabling spinal injury until early 2014 (see page 11 above) and such reports are inconsistent with the 2014 diagnostic testing and clinical findings of Dr. Ali already discussed (see page 13 above).

Despite appropriately rejecting Dr. Choudhry's and Dr. Malouf's assertions that O'Dell's physical impairments were work preclusive, ALJ Stacchini nevertheless incorporated the credible aspects of their opinions into his RFC determination.  Both Dr. Choudhry and Dr. Malouf assessed that O'Dell was able to stand, sit, and walk for one hour at a time.  (See pages 7, 12 above.)  When combined with O'Dell's own testimony to that effect (see page 5 above), these assessments serve as substantial evidence supporting ALJ Stacchini's RFC determination that O'Dell "needs to alternate sitting and standing at one hour intervals throughout the day." (R. 15.)  Similarly, both Dr. Choudhry and Dr. Malouf indicated that O'Dell retained the ability to lift and carry weights corresponding to an ability to perform at least light work (see pages 7, 11-12 above), thus supporting ALJ Stacchini's determination that O'Dell "has the residual functional capacity to perform light work" (R. 15).  These aspects of Dr. Choudhry and Dr. Malouf's opinions were consistent both with each other and with O'Dell's reported activities of daily living.

The Court finds that ALJ Stacchini's RFC determination is supported by substantial

evidence in the record. See, e.g., Sizer v. Colvin, 592 F. App'x 46, 47 (2d Cir. 2015) (RFC

determination "based on the medical opinion evidence, the objective medical evidence, and

Appellant's testimony at the ALJ hearing" was supported by substantial evidence.); Diaz v. Shalala,

59 F.3d 307, 315 (2d Cir. 1995) ("The opinions of three examining physicians, plaintiff's own

testimony, and the medical tests together constitute substantial evidence adequately supporting the

[Commissioner's] conclusion that plaintiff's injuries did not prevent her from resuming her job as

a sewing machine operator."); Fuentes v. Colvin, No. 13-CV-6201, 2015 WL 631969 at *8

(W.D.N.Y. Feb. 13, 2015) ("'The opinion of a consultative examiner can constitute substantial

evidence supporting an ALJ's decision.'").

      O'Dell argues that to the extent ALJ Stacchini gave only partial weight to the

opinions of O'Dell's treating physicians, ALJ Stacchini was required to "fill in the gaps in the

record" by either requesting clarification from those doctors or "bringing in his own independent

medical expert." (Dkt. No. 24: O'Dell Br. ¶¶ 16-17.)  It is the "well-established rule in [the Second]

circuit" that the ALJ must develop the record:

> [I]t is the well-established rule in our circuit "that the social security ALJ, unlike a
> judge in a trial, must on behalf of all claimants . . . affirmatively develop the record
> in light of the essentially non-adversarial nature of a benefits proceeding."  Lamay
> v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation
> marks and brackets omitted) [, cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)];
> accord Butts v. Barnhart, 388 F.3d 377, 386 (2d Cir. 2004), [amended on other
> grounds], 416 F.3d 101 (2d Cir. 2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir.
> 1996); see also Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir.
> 1972) (pro se claimant).  Social Security disability determinations are "investigatory,
> or inquisitorial, rather than adversarial." Butts, 388 F.3d at 386 (internal quotation
> marks omitted).  "[I]t is the ALJ's duty to investigate and develop the facts and
> develop the arguments both for and against the granting of benefits."  Id.  (internal
> quotation marks omitted); accord Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).  The Second Circuit has clarified, however,

that "'where there are no obvious gaps in the administrative record, and where the ALJ already

possesses a "complete medical history," the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'"  Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (quoting Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996))).[39/]

The record before ALJ Stacchini contained multiple doctors' opinions addressing O'Dell's spinal, heart, and mental impairments.  (See pages 5-19 above.)  Where ALJ Stacchini found a treating physician's opinion inadequate or worth little weight, he was able to fill any resulting gap in the record by relying on a different, credible physician's opinion on the same issue.  (See pages 22-23 above.)  The gap-filling medical opinions in the record were further supplemented by O'Dell's testimony during his hearing, at which ALJ Stacchini played an investigatory role by asking numerous questions.  (See R. 30-63.)  Finally, the Court notes that at the beginning of his hearing, O'Dell's own counsel answered "[y]es" when ALJ Stacchini asked: "do I have all medical evidence that bears on disability . . . including any and all opinions[?]"  (R. 33.)  In light of these facts, the Court concludes that ALJ Stacchini made his determination on the basis of a record containing no obvious gaps and a complete medical history, and that he therefore had no obligation to further develop the administrative record in the ways suggested by O'Dell's counsel.

### E.  O'Dell Did Not Have The Ability To Perform His Past Relevant Work

The fourth step of the five-step analysis asks whether O'Dell had the residual

---

[39/]  See also, e.g., Ramos v. Comm'r of Soc. Sec., 13 Civ. 6561, 2015 WL 708546 at *18 (S.D.N.Y. Feb. 4, 2015) (ALJ had no further obligation to develop the record where the medical record from the treating clinic was "extensive, including more than two years of consistent treatment notes."); Matos v. Colvin, 13 Civ. 4525, 2014 WL 3746501 at *9 (S.D.N.Y. July 30, 2014) (ALJ properly fulfilled duty to develop the record where he questioned claimant thoroughly, solicited testimony from medical and vocational experts and admitted voluminous submissions from physicians.), aff'd, 618 F. App'x 14 (2d Cir. 2015).

functional capacity to perform his past relevant work.  (See page 27 above.)  O'Dell previously

worked as a police officer and an EMT.  (See page 23 above.)  ALJ Stacchini concluded that

O'Dell's "past work was performed above [his] residual functional capacity," and that he therefore

did not have the ability to perform his past relevant work.  (See id.)  Because this finding favors

O'Dell and is not contested by the Commissioner (see generally Dkt. No. 28: Comm'r Br.), the Court

proceeds to the fifth and final step of the analysis.

### F.    There Are Jobs In Substantial Numbers In The Economy That O'Dell Can Perform

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence

to show the existence of alternative substantial gainful work which exists in the national economy

and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

1980).[40/]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404,
> Subpart P, App. 2, commonly referred to as "the Grid".  The Grid takes into account
> the claimant's residual functional capacity in conjunction with the claimant's age,
> education and work experience.  Based on these factors, the Grid indicates whether
> the claimant can engage in any other substantial gainful work which exists in the
> national economy.  Generally the result listed in the Grid is dispositive on the issue
> of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

---

[40/]    See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc.
Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir.
2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d
72, 77 (2d Cir. 1999).

promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), R. & R. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional

limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ

is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)).

ALJ Stacchini properly relied on the testimony of vocational expert Linda Stein to

determine that jobs O'Dell could perform exist.   (See page 23 above.)[41/]   Stein opined on the

availability of work for a person of O'Dell's age, education and work experience who is able to do

full range of light work, with the caveats, inter alia, that he should be allowed to alternate between

sitting and standing every hour; he should be limited to a job that involves only "simple, routine

tasks such as those demanded of SVP: 2 jobs or less," and "low stress" jobs defined as those

involving only occasional decision making and changes in the workplace.   (See page 20 above.)

Stein opined that a person with those limitations could work as a ticket taker, cashier or information

clerk, and that such jobs exist in the national economy.   (See id.)   ALJ Stacchini relied upon the

vocational expert's testimony in reaching his conclusion when he specifically referred to those jobs

---

[41/]   A vocational expert can provide evidence regarding the existence of jobs in the economy and
a particular claimant's functional ability to perform any of those jobs.   20 C.F.R.
§§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir.
2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d
Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862
F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983);
DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada
v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck,
M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006)
(Peck, M.J.), R. & R. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); De Roman v.
Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.);
Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller
v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided
several examples of unskilled . . . jobs that are available in the national and local economies
for a person with [plaintiff's] condition, age, education, and work experience. . . .
Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the
national economy.").

in his findings.[42/]   (See page 23 above.)  Accordingly, ALJ Stacchini's decision was supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that O'Dell was not disabled within the meaning of the Social Security Act during the period from May 27, 2011 to June 20, 2014 is supported by substantial evidence.  Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 27) is GRANTED and O'Dell's motion (Dkt. No. 24) is DENIED.  The Clerk of Court shall close the case.


SO ORDERED.


Dated:        New York, New York
              November 22, 2016


              _____
              **Andrew J. Peck**
              United States Magistrate Judge


Copies ECF to:        All Counsel

---

[42/]    O'Dell argues that ALJ Stacchini ignored Stein's testimony that there was no work in the national economy for someone with O'Dell's limitations that also has to be off task for twenty percent of the workday.  (See Dkt. No. 24: O'Dell Br. ¶ 14.)  As already discussed, however, ALJ Stacchini's RFC assessment did not include the caveat that O'Dell be permitted to be off task for twenty percent of the workday (see page 21 above), and that RFC assessment was supported by substantial evidence (see pages 43-52 above).  O'Dell's argument is without merit.